UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

KENDRA BUSH,

     Plaintiff,

                                      Case No. 3:23-cv-253-TJC-LLL

v.

HOMER DELOACH, in his Official
Capacity as Sheriff, Putnam
County, Florida,

     Defendant.

_____

**O R D E R**

**THIS CASE** is before the Court on the Defendant's Renewed Motion for Summary Judgment, which has been fully briefed. Docs. 70, 79, 88, 89. [1] Plaintiff Kendra Bush has sued her former employer, Sheriff "Gator" DeLoach. The Second Amended Complaint has three claims: public whistleblower retaliation (under Fla. Stat. § 112.3187), race discrimination (under Title VII and the Florida Civil Rights Act), and retaliation (under the FCRA).

---

[1] Despite a procedural history including multiple extensions and reopening discovery (Doc. 65), the briefing in this case could have been better. See infra n.35. Bush's opposition exceeded the expanded page limit by more than ten pages by "incorporating through reference" entire arguments from prior filings. See Doc. 79 at 14 n.1, 15 nn.2 & 3, 19 n.9. Even though almost 200 exhibits were filed, the record was sometimes incomplete, with counsel making assertions not well supported. See infra nn.6, 8, 24. Counsel is capable of better and is expected to do better.

## I.  BACKGROUND[2]

### A. Employment Overview

Bush, who is Black, worked as a corrections officer with the Putnam County Sheriff's Office. She was first employed in 2010 through December 2014. Doc. 78-30 ¶¶ 2–3. The Sheriff rehired Bush in March 2015, and she remained employed until her resignation on January 20, 2022. Id. ¶¶ 3–4; Doc. 71-1 at 295.[3] Bush claims she was constructively discharged. This litigation concerns Bush's workplace complaints starting in 2021.

### B. Training at the Booking Desk (2021)

In March, Bush was assigned to the booking desk for training. Doc. 78-30 ¶ 7. Learning booking procedures helps with the promotional process. Id. ¶ 11. She alleges two white officers, Lieutenant Bill Hamby and Sergeant David Looney, did not train her properly.[4] Id. ¶¶ 7–8. Bush complained training would start in the middle, instead of the beginning of a process. Doc. 71-1 at 97–98 ("[t]hey trained me, but they . . . weren't training me the right way."). She complained to Captains Ryan Dunn and Pardon, both white, and her complaint was shared with Hamby and Looney. Doc. 78-30 ¶¶ 10, 12. Hamby and Looney

---

[2] Evidence is construed in the light most favorable to Bush. See Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1098 (11th Cir. 2014).

[3] Page references are to ECF page number.

[4] Initial references to individuals include first names and titles when known.

then shunned Bush, but interacted with white officers, allegedly denying Bush "learning experiences and additional training." Id. ¶¶ 13–14. Bush managed to train herself on the booking desk duties, but it took longer. See id. ¶¶ 14–15. The booking training did not impact her pay or benefits. Doc. 71-1 at 99–100.

C. Complaint about Captain Silva (circa 2021)

Bush alleges she verbally complained to Major Valdes that Captain Clayton Silva, her supervisor, was discriminating against her due to race.[5] Doc. 78-30 ¶ 16. Bush alleges the complaint was not investigated or passed up the chain of command. Id. ¶¶ 16–17. After Bush complained about Silva, anonymous notes began appearing in her personnel file.[6] Id. ¶ 18.

---

[5] It is not clear when Bush made this complaint, but on June 29, 2021, Silva recused himself from discipline proceedings for Bush, stating he had been informed "less than a year ago" of Bush's complaint he was discriminating against her. Doc. 36-35. Per Silva, the "complaint was found to have no merit and was not formalized." Id.

[6] There are at least sixteen anonymous notes in evidence, dated on or about incidents between May 25, 2021, through December 26, 2021. See Doc. 79 at 3, 22 n.13. Authorship and source are disputed, with both parties making allegations not fully supported by the evidence. For instance, the Sheriff alleges the notes were kept by Lieutenant Ray Johnson and not part of Bush' personnel file but does not provide a record cite. Doc. 88 at 7–8. Bush argues no manager admitted authorship and cites deposition testimony from Dunn, Corporal CJ Dean, and Colonel Joseph Wells, but not Johnson. Doc. 79 at 3. The earliest three anonymous memos match documents Dean authored. Compare Doc. 36-33 at 10–12 (memos from Dean) with Docs. 36-30, 36-31, and 36-32 (no author). At his deposition, Dean was asked about other anonymous memos but not these three. See generally Doc. 36-75 at 4.

3

D. Parking Spot Dispute (2021)

Next, Bush complains about an interaction with Sergeant Rash, white, over a parking space. Id. ¶¶ 19–28. On June 23, Bush parked in a space reserved for shift sergeants. See Doc. 71-1 at 51–52. Rash called her and, in an allegedly belittling manner, told Bush to move her car. She did, but she and Rash also had a "heated discussion."[7] Id. at 240. Rash gave Bush written counseling (not considered discipline). See id. at 238, 253. Bush made a written complaint to Lieutenant Karly Yoder and Major Scott Surrency, both white, about how Rash spoke to her, saying Rash treated her differently than other corporals and line officers, and identifying other officers (corporal and deputies) who parked in the reserved spaces without incident. Doc. 78-30 ¶¶ 21–27; Doc. 71-1 at 241. Bush's written complaint does not specify the others being treated differently are white but does allege "Rash is prejudice[d] and bias[ed] towards" her and she feels "targeted because it is promotion time."[8] Doc. 71-1 at 241. Bush met with Yoder

---

[7] Bush testified "I do remember he said this. When you actually test and pass the test, then maybe you can park in the sergeant spot. . . . But he was the one cursing and being rude. I wasn't rude to him." Doc. 71-1 at 52. Rash has a different version: that Bush was belligerent when told to move her car and told him he "should learn how to f---ing talk to people better." Id. at 237.

[8] The record does not have a written complaint to Yoder and Surrency. There are two memos to Captain Dunn complaining about Rash and the parking spot interaction. See Doc 71-1 at 240–41. Because these memos have the language Bush describes being in the written complaint to Yoder and Surrency, the Court has relied on them as evidence of her written complaint and cites them accordingly.

4

and Surrency, but instead of addressing her concerns about Rash, they brought up "an old prior incident" that Bush disputes, about taking an inmate for medical treatment.[9] Doc. 78-30 ¶ 28. On June 29, Dunn recommended (to Surrency) Bush be disciplined for three prior incidents (on June 12, 13, and 17) and that the parking spot dispute (along with a May 25 incident) be investigated further. Doc. 36-33 at 2–4. Bush was not disciplined and there were no changes to her job.[10] See Doc. 71-1 at 55–56, 253. Bush alleges the anonymous notes to her file increased after this incident.[11] Doc. 79 at 22.

E. Promotions to Sergeant (2021)

Promotional opportunities for sergeant were announced June 1, with the process overseen by Surrency, Dunn, Silva, and Yoder. Doc. 71-1 at 232–33; see Doc. 71-2 at 43. The process has three parts: a written test, a panel interview (sometimes called "oral board"), and a candidate assessment. See Doc. 71-1 at 232–33. The assessment can add up to ten points to "reward employees for their tenure, education, conduct and military service." Doc. 36-62 at 3.

---

[9] The evidence documents an incident involving Bush and an inmate moved to medical on June 17, 2021, but it is not clear this is the same "old prior incident." Doc. 36-33 at 13.

[10] The recommended discipline was two suspensions (totaling 36 hours), written reprimand and counseling. Doc. 36-33 at 4.

[11] There are two anonymous notes in July and no further anonymous notes until October 15, 2021.

On July 1, Bush passed the written exam for sergeant. Doc. 78-30 ¶ 30. Any test question missed by 60% of test takers was discarded. See Doc. 71-2 at 42. Three people, including Bush, passed before any adjustment. Doc. 78-30 ¶ 44. Eight people, including Bush, passed after the adjustment. See Doc. 71-1 at 235. The day of the interview, Yoder called Bush and moved up her interview time by more than an hour. Doc. 78-30 ¶¶ 32–33. Yoder told Bush to arrive in twenty minutes even though Bush was more than twenty minutes away. Id. ¶ 33. Bush was late and believes this negatively impacted her interview.[12] See id. ¶ 35; Doc. 79 at 5.

Colonel Joseph Wells forwarded the top five candidates, all white, to the Sheriff for promotional consideration.[13] See Doc. 71-1 at 234. Bush ranked sixth and was not forwarded.[14] See id. at 235. Bush was the only Black to pass the exam. Id. at 48. Corporal CJ Dean and Deputy Steven Callahan, both white, were recommended by Wells and promoted to sergeant. Id. at 234; Doc. 78-30 ¶ 41. After the promotions were announced, Bush emailed Wells complaining

---

[12] Bush had the third lowest interview rating. Doc. 71-1 at 235. Records from the oral board and other parts of the promotion process were not kept. Doc. 36-79 at 44.

[13] Per the policy, either the top three or five candidates will be further considered, depending on number of vacancies and eligible candidates. Doc. 36-62 at 3.

[14] Bush alleges one person in the top five, Shea Kingston, was not eligible because he was on probation. The policy states to take the exam the person can "not be on probation for any reason." Doc. 71-1 at 233.

6

because she passed the test without the "curve" but was not one of the candidates forwarded for consideration.[15] Doc. 78-30 ¶ 44.

F. Report of Failure to Count (2021)

On October 29, Bush reported that two white deputies, Trevor Bishop and Michael Walker, were ordered to do an inmate recount as part of a shift transfer, but did not recount.[16] Doc. 71-1 at 57–59. She reported this to Lieutenant Ray Johnson, who told Bush the next day he had reviewed the video and confirmed they did not recount. Id. No investigation was done and there was no discipline. Id. at 59–60. The month before, there was an investigation into three officers (two Black and one bi-racial) for not properly doing a count and recount. The two Black officers were ultimately terminated.[17] Bush asked Johnson if there would be an internal investigation into Bishop and Walker and alleges this was a report of possible race discrimination for the two Black officers. Doc. 78-30 ¶ 47. Bush alleges that after this report, retaliation towards

---

[15] The email from Bush is not part of the record.

[16] Bush testified she was working in "North Tower" and Bishop and Walker were in "Times Square." Doc. 71-1 at 57–59. In the tower, Bush could observe other locations by video.

[17] The two Black officers were Terrance Haynes and Gregory Session. Haynes was terminated on November 10, 2021. Doc. 40 at 7 in Haynes v. DeLoach, 3:22-cv-1104. Session was initially terminated on October 28, 2021, reinstated to administrative leave, and then finally terminated on November 16, 2021. Doc. 99 at 5 in Session v. DeLoach, 3:23-cv-170.

7

her increased, including escalation of the anonymous notes in her personnel file. Id. ¶¶ 46–47; Doc. 79 at 22.

G. Investigation into Early Work Departure (2021)

On November 9, Bush left her overnight shift early to take a spare car key to her daughter in Jacksonville and did not return to complete her shift. See Doc. 71-1 at 60–61, 275. This prompted an investigation into whether she left work without permission or was insubordinate by failing to return as allegedly ordered. See id. at 244–51. The investigation concluded there was miscommunication and did not sustain any violations.[18] Id. Bush was informed on January 13, 2022, that the alleged violations were not sustained. Id. at 344.

H. Investigation into Taser Use (2021)

Another incident occurred on November 22. Bush and three officers were moving an inmate, who was intermittently resistant or uncooperative. Bush tased the inmate three times. See id. at 336. Bush and the other three officers completed incident reports.[19] Id. at 319–21. The next day, Dean reported "[p]possible excessive use of taser" to Surrency. Id. at 318. Dean noted each time

---

[18] Bush was notified of the investigation on December 16, 2021. Doc.71-1 at 270.

[19] Each officer's incident report described the tasing slightly differently. No incident report directly raised a concern of excessive force, but at least one indicated the first taser discharge occurred when the inmate was falling, and the second and third taser discharges occurred when officers were trying to stand the inmate up. Doc. 71-1 at 320.

Bush used her taser the other three deputies appeared to have the inmate under control and none of the incident reports mentioned giving a verbal command that the taser would be deployed.[20] Id. On December 2, Surrency requested Wells authorize an investigation into the taser incident. Id. at 309, 315. Instead, Wells referred the incident to the Response to Resistance Committee for review. Id. at 309, 314.

The Committee, comprised of Captain Elton Miller, Yoder, and Sergeant Nick Vieira, issued its report on December 14, 2021, concluding the first use of taser could have been reasonable, while the second and third uses were unnecessary and an excessive use of force, possibly meeting the requirements of criminal battery.[21] Id. at 310-13. The Committee unanimously recommended remedial taser training for Bush and further review. Id. at 313. The next day, Wells approved an internal investigation. Id. at 309. Because of the possible battery, the state attorney was notified.[22] Id. at 289.

---

[20] There is video of the incident and Dean's memo appears to be based on review of the video. See Doc. 71-1 at 318 (memo); Docs. 36-1 to 36-3 (videos).

[21] The Committee report identifies other issues including that the inmate was handcuffed in front of body instead of behind. Doc. 71-1 at 337. At her deposition, Bush testified she deployed the taser twice, not three times, but her incident report indicates there were three discharges, and other evidence indicates there were three discharges. Compare Doc. 71-1 at 68–69 (deployed taser twice) with Doc. 71-1 at 319 (deployed taser three times).

[22] Bush testified that after she resigned, the Sheriff was trying to have her arrested for battery because it asked the State Attorney's Office to review the incident. Doc. 71-1 at 68, 70–72. She was not arrested. Id. at 70. The report

9

The investigation reviewed whether excessive force was used and was conducted by John Zagar. Zagar issued the report on April 1, 2022, the day after the state attorney decided to not bring charges. Id. at 286–90. The investigation sustained multiple violations, including use of excessive force. [23] Id. In accordance with Fla. Stat. 943. 1395(5), the investigation report was sent to the Florida Department of Law Enforcement. See id. at 291.

Bush alleges other instances of excessive force involving white officers, before and after 2021, were treated differently. These include: (a) in 2017 or 2018 Breckenridge grabbed an inmate by the neck and tried to drag the inmate up two flights of stairs, (b) in 2019 or 2020, Breckenridge kicked an inmate, (c) in 2020 or 2021, Breckenridge and Yoder were involved in dragging an inmate, (d) in 2020 a white female officer (Green) hit an inmate in the back of the head with a sandwich, (e) in 2020, four officers (Callahan, Greco, Kingston, and Richie) used excessive force against an inmate who was restrained and shackled,[24] and (f) in the same 2021 incident when Bush tasered the inmate,

---

sustaining excessive force violations was required to be sent to Florida Department of Law Enforcement. Id.; Fla. Stat. § 943.1395(5). Bush hired an attorney and FDLE did not find probable cause to pursue any charges. Doc. 71-1 at 68.

[23] The report also sustained violations for conduct unbecoming and failure to treat an inmate properly. Doc. 71-1 at 289–90.

[24] Bush cites an investigation involving Callahan, but it does not involve Greco, Kingston and Richie and is for an incident in 2019. See Doc. 79 at 11, citing Doc. 36-28 (Ex. 32).

Bishop grabbed the inmate by the throat. Doc. 79 at 11–12; Doc. 78-30 ¶¶ 52, 55–61.

### I. Discipline for Tardiness (2022)

On January 4, 2022, Dean disciplined (written reprimand) Bush for tardiness. Doc. 71-1 at 341. Bush testified she was tardy "every now and then" and had been counseled before she was disciplined but also testified she had been arriving to work 5-10 minutes late for years, without issue. See id. at 92–93, 111. It was only after she complained to Johnson on October 29 (that Walker and Bishop failed to recount) that she was counseled and disciplined by Dean.[25] See id. at 110. Bush testified others were late but not counseled. Id. at 116.

### J. Bush's resignation (2022)

The two investigations were stressful for Bush, and she began experiencing hair loss and other symptoms of anxiety. Bush's doctor prescribed medication for stress and anxiety and told her "to leave [her] job because stress was a silent killer." Id. at 120. Her resignation email stated she was "physically and mentally exhausted from being scrutinized, harassed, singled out, lied on, and treated unfairly by . . . co-workers and supervisors." Id. at 295. Bush alleges she was constructively discharged. Doc. 78-30 ¶¶ 62–66.

---

[25] One anonymous note about being tardy is from October 15, 2021. Doc. 36-38.

11

Bush started looking for other employment in December 2021. Doc. 71-1 at 35. That month she was offered and accepted a job, but told her new employer she could not start work until giving the sheriff two weeks' notice. Id. at 35–36. On January 20, 2022, she resigned, effective immediately. Id. at 295. Bush testified she had been going back and forth about whether to resign and only decided to resign the day she submitted her resignation. Id. at 34–35, 41.

## II.   ANALYSIS

### A. Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

### B. Count I – Violation of Florida's Whistleblower Act

To establish a prima facie case of retaliation under Florida's Whistleblower Act, Bush must show she: (1) engaged in protected activity; (2) suffered an adverse employment action; and (3) there is a causal connection between the two. See Batz v. City of Sebring, 794 F. App'x 889, 900–01 (11th Cir. 2019) (citations omitted).[26] The Sheriff disputes each element.

Protected activity under the FWA must meet statutory requirements

---

[26] The Court does not rely on unpublished opinions as binding precedent, however, they may be cited when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022).

about the nature of the disclosure, how it is made, and to whom it is made. Fla. Stat. § 112.3187(5) – (7). Relevant here, there must be a "written and signed complaint" to an appropriate local official or "participat[ion] in an investigation, hearing, or other inquiry conducted by any agency[.]" See id.; see also Anterio v. City of High Springs Florida, 762 F. App'x 891, 896–97 (11th Cir. 2019). And the complaint must be about (i) an actual or suspected violation of law, rule, or regulation involving either "substantial and specific danger to the public's health, safety, or welfare" or (ii) "gross mismanagement, malfeasance misfeasance, gross waste of public funds, . . . or gross neglect of duty committed by an employee or agent of an agency[.]" Fla. Stat. § 112.3187(5).

Bush argues three incidents are protected activity under the FWA: (1) her verbal complaint that Silva was discriminating against her because of race, (2) her written complaint that Rash was "prejudice[d] and bias[ed] towards her," and (3) answering questions from Johnson after reporting the failure to recount by two white deputies while two Black deputies had been "fired over the exact same misconduct." Doc. 79 at 20–21.

The complaint about Silva is not protected whistleblower activity because it was not part of an investigation and not in writing.

The email about Rash generally alleges Rash treats Bush improperly and differently. While it mentions prejudice and bias, it does not mention race. Rather, Bush thinks she is being targeted "because it is promotion time." It

13

reflects frustration with how Rash treats her but does not involve "substantial and specific danger to the public's health, safety, or welfare, . . . . gross mismanagement, malfeasance misfeasance, gross waste of public funds, . . . or gross neglect of duty." Fla. Stat. § 112.3187(5). Nor is it sent to an appropriate official, just Captain Dunn. The email is not protected whistleblower activity.

As for the recount, Bush verbally reported the failure to recount to Johnson and followed up with him the next day.[27] Bush testified "[n]othing was done" in response to her report and Johnson did not recall her report. Doc. 71-1 at 58–59. Again, there was not a written complaint, and she did not complain as part of an investigation. Bush did not engage in any protected whistleblower activity.[28]

However, Bush's whistleblower claim also fails because there was not a timely adverse action. The FWA requires a civil action be filed within 180 days of the alleged violation. Fla. Stat. § 112.3187(8)(b). Bush filed her lawsuit in

---

[27] Bush's brief states she was questioned by "Lieutenant Walker." Doc. 79 at 21. The Court presumes this should be "Lieutenant Johnson." Bush's testimony is that she asked Johnson if Walker and Bishop would be investigated like Haynes and Session were being investigated. Doc. 71-1 at 57.

[28] Bush argues protected activity is to be liberally construed, and the Court agrees. But a liberal construction that allows any complaint to be protected activity is not consistent with the statutory text, which limits what will be deemed protected activity. Cf. Dep't of Children and Families v. Herstein, 399 So. 3d 384, 391 (1st DCA 2025). To the extent Bush argues she met the statutory requirements for protected whistleblower activity based on a verbal complaint outside of an investigation, the Court disagrees.

14

state court on June 28, 2022, so the only possible adverse action is the alleged constructive discharge. See Doc. 35 at 18.

"Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit [her] job." Davis v. Legal Servs. Ala., Inc., 19 F.4th 1261, 1268 (11th Cir. 2021) (citing Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009)). "This is an 'onerous task' and requires pervasive and severe conduct by the employer going beyond that required for a hostile work environment claim." Bryant, 575 F.3d at 1298–99, 1307. Determining whether circumstances amount to constructive discharge is an objective standard, not dependent on the subjective beliefs of the plaintiff. Boyle v. City of Pell City, 866 F.3d 1280, 1289 (11th Cir. 2017) (citing Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001)). The legal question is not whether Bush was stressed or frustrated, but whether a reasonable person in her shoes would have found the work situation so bad, resignation was the only option.

Bush had multiple complaints about work in 2021. In June, Rash counseled her for "insubordination & disrespect" over the parking incident. In July, Bush passed the sergeant exam but was not promoted. In October, she reported misconduct (failure to recount by two white officers) that was not investigated. In November, she left work early, prompting an investigation. Also in November, she tased an inmate three times, prompting an investigation.

15

In January, she was disciplined for being tardy.[29]

Even when combined, these circumstances do not meet the high objective standard for constructive discharge. The counseling from Rash was not considered discipline, and Bush admits she parked in a spot reserved for sergeants, even though she was not a sergeant. Eight people passed the sergeant exam, two were promoted, leaving Bush as one of six people who passed the exam, but did not get promoted. The failure to investigate two white officers who did not recount did not directly impact Bush. Bush was investigated because she left an understaffed shift for personal reasons and did not return to complete her shift. A week before she resigned, Bush was told the investigation into her early departure would not sustain any alleged violations and not result in any discipline. Bush discharged her taser three times. While Bush disputes using excessive force, the Committee review and internal investigation (along with the recommendations for Committee review and internal investigation) concluded there was excessive force or that the use of force was questionable. Bush was counseled for being tardy. She admits she was tardy, but that her tardiness was previously acceptable or overlooked.

---

[29] The booking desk training is not considered here because it was before she complained and therefore cannot be retaliation for her complaint. Even if it were considered, it would not change the outcome. Similarly, no FDLE action is considered, because that was necessarily after the Sheriff's investigation was completed, months after Bush resigned.

16

These problems reflect workplace disagreements, not a workplace so intolerable Bush's resignation was necessary. See Ounjian v. Globoforce, 89 F.4th 852, 859 (11th Cir. 2023) ("[t]he alleged instances of criticism, improper disclosure of personal information, and withdrawn demotion threat, taken individually or collectively, do not meet the high bar for stating a constructive discharge claim."); Davis v. Legal Servs. of Ala., 19 F.4th 1261, 1268 (11th Cir. 2021) (holding "evidence of unpleasant disputes and disagreement with coworkers who then filed complaints" was not enough to "paint a picture of intense, intolerable harassment usually seen in constructive discharge."); Friedman v. Town of Pembroke Park 2025 WL 3627102 at *2–3 (11th Cir. Dec. 15, 2025) (affirming dismissal for failure to state a claim even though plaintiff was called a "Nazi", there were public requests for her termination, and she was "demeaned on social media.").

Bush's constructive discharge claim has other weaknesses. Bush knew of the two investigations around December 16, 2021, but she worked for another month. See Doc.78-30 ¶ 48; Doc. 71-1 at 61, 269, 307. Bush testified she applied for and accepted another job in December 2021 and that she did not decide to resign until the day she submitted her resignation, on January 20, 2022.[30] Two

---

[30] Bush testified she started looking for a second job. Doc. 71-1 at 123. Accepting a second job but continuing to work for the Sheriff has an arguably different impact on a constructive discharge claim than accepting other primary employment and continuing to work. However, Bush also testified she told her

things happened between December 16 and January 20: she received written counseling for being tardy and she was informed the first investigation would be resolved in her favor. These circumstances do not support a finding of constructive discharge. See Davis, 19 F.4th at 1268 (noting the plaintiff resigned four days after an investigation was started and "constructive discharge will not generally be found if the employer is not given sufficient time to remedy the situation.") (quoting Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996)); Friedman, 2025 WL 3627102 at *3 (noting there was no constructive discharge because plaintiff continued working for a month after complaining about "bullying and intimidation" and after her resignation).

Bush's resignation email said she was "physically and mentally exhausted from being scrutinized, harassed, singled out, lied on, and treated unfairly by . . . co-workers and supervisors."[31] Doc. 71-1 at 344. It cites the

---

new employer when she accepted the job she could not start until giving the Sheriff two weeks' notice. Whether Bush accepted a second job or an alternate job in December, the circumstances do not support finding she was constructively discharged when she resigned a month later.

[31] Plaintiff's second declaration provides another reason she left her job: because she feared "other officers would not come to [her] aid in the event of an emergency." Doc. 78-30 ¶ 66 (signed October 27, 2025). Fear that she would not be supported by other officers is not mentioned in her first declaration. See Doc. 36-69 (dated June 14, 2024). The words "fear" and "afraid" are not mentioned in her deposition. Bush testified she resigned for the reasons in her email. Doc. 71-1 at 38. Fear about lack of support is not mentioned in the email and Bush does not provide examples or other evidence to support her allegation that other

pressure of two ongoing internal investigations and that the "unfairness and untruthfulness has started to affect [her] health." Id. These impacts include anxiety, high blood pressure, hair fallout, weight gain and acid reflux. Id. at 135–37, 344. Bush says her doctor told her she needed to leave her job because stress was a silent killer. [32] Id. at 119. While Bush's frustration may be understandable, her subjective reaction to the work stress does not meet the objective standard for constructive discharge. And the cases cited are distinguishable. Cf. Lerman v. Xentel, Inc., 2009 WL 4632881 at *3 (S.D. Fla. Dec. 2, 2009) (finding there was a fact issue of constructive discharge when plaintiff, who was a paraplegic, was denied a reasonable accommodation of a handicapped accessible bathroom at work).

Accordingly, summary judgment is due to be granted on the whistle-blower claim.

C. Count II - Race Discrimination Claims[33]

Because there is no direct evidence of discrimination, Bush can establish race discrimination by either the McDonnell Douglas burden shifting paradigm

officers would not support her.

[32] The record does not indicate when Bush saw her doctor and does not contain evidence from the doctor, only Bush's testimony about what he said.

[33] The Sheriff raises arguments about timeliness and administrative exhaustion of Bush's race discrimination claims under Title VII and the FCRA. The Court presumes, without deciding, that the claims are properly raised.

19

or through a convincing mosaic of evidence sufficient for a jury to infer discrimination. See Ismael v. Roundtree, 161 F.4th 752, 759–62 (11th Cir. 2025). Bush argues she has done both.

To establish a prima facie case of race discrimination under McDonnell Douglas, Bush must show she: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly situated individual outside her protected class. Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).[34] "If the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action. If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006) (internal citation omitted).

To establish pretext, the plaintiff must show "the proffered reason was not the true reason for the employment decision . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276,

---

[34] FCRA claims are analyzed using Title VII's framework. Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1325 (11th Cir. 2020).

1289 (11th Cir. 2005) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)). The evidence for pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (citation modified). The parties dispute the third and fourth elements of a prima facie case and whether Bush has shown pretext.

The parties contest whether any adverse action occurred for which there is a comparator. While an adverse action typically involves changes to rank or pay, sufficient changes to responsibilities, perks and schedule may be an adverse action. See Muldrow v. City of St. Louis, 601 U.S. 346, 350-35 (2024). An alleged comparator must be "similarly situated in all material respects." Lewis v. City of Union City, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc); see also Johnson v. Miami-Dade Cnty., No. 24-12676, 2026 WL 772380, at *4–6, --- F.4th --- (11th Cir. March 19, 2026). A similarly situated comparator will ordinarily have (1) engaged in the same behavior; (2) been subject to the same employment policy, guideline, or rule; (3) had the same supervisor; and (4) shared a similar employment or disciplinary history. Lewis, 918 F.3d at 1227-28.

21

Bush complains about: (1) the parking spot dispute with Rash, (2) not being promoted to sergeant, (3) the discipline for being tardy, (4) the investigation for leaving her shift early, (5) the investigation for use of excessive force, and (6) being constructively discharged.[35] Because the Court has already decided there was no constructive discharge, it is not addressed again.

There is no prima facie case based on the parking spot dispute with Rash. Bush identifies three white officers—Jones, Brady, and Richie—whom she alleges parked improperly in the sergeant space but were not corrected by Rash. Even assuming the circumstances are comparable, there is no adverse action. She alleges Rash was belligerent and disrespectful in his communication with her. They each complained about the other. Rash's written counseling to Bush was not discipline, and Bush does not identify other problematic interactions with Rash. The parking spot spat was a one-time workplace disagreement, not an adverse action supporting race discrimination. Even if Bush could establish a prima facie case, she could not show pretext: she parked in a spot reserved for

---

[35] Bush's argument about race discrimination identifies being disciplined, the failure to promote and internal investigations along with general references to being scrutinized and harassed, without stating clearly what was the undue scrutiny and harassment. See Doc. 79 at 15. Because the Court construes the record in the light most favorable to Bush, it has construed undue scrutiny to include the parking lot incident. Bush argues that actions by FDLE were adverse actions, but there is no evidence FDLE's actions were based on anything other than the report it was statutorily required to receive. Therefore, the Court does not address FDLE activity as a possible adverse action.

sergeants, but she was not a sergeant. Being told to move her car from a reserved spot is not an adverse action.

There is no prima facie case based on discipline for being tardy because there are no comparators identified. Bush testified others were tardy and not counseled, but does not provide any details, including identifying the alleged comparators. Rather, Bush alleges her tardiness was previously acceptable under prior administrations. Doc. 71-1 at 93. Accepting this as true, there is no difference in treatment based on her race.[36]

There is no prima facie case based on the investigation for leaving work early because no comparator is identified. Nor can Bush establish pretext. Bush admits she left her shift early for personal reasons and did not return to work. Generally, an investigation itself is not an adverse action, although the outcome of an investigation might be an adverse action. See Rademakers v. Scott, 350 F. App'x 408, 413 (11th Cir. 2009). The basis for the investigation was objectively reasonable: Bush left an understaffed shift, even though her supervisor alleges he sked her to find alternatives that would not require her to leave, or if she did

---

[36] Bush did, however, testify her request to adjust her work hours (to help with tardiness) was treated differently than a white deputy whose work hours were changed because of childcare responsibilities. Doc. 71-1 at 131. This is not argued in her brief and even if it were, Bush testified the white deputy was in a different position and therefore is not a proper comparator. See id.

leave to return. See Doc. 71-1 at 276. The investigation did not sustain any alleged violation and Bush was not disciplined.

The investigation for possible use of excessive force is a closer call. Bush alleges other excessive force incidents by white officers are comparable but handled differently (no investigation or no discipline). These include: (1) in 2017 or 2018 Breckenridge grabbed an inmate by the neck and tried to drag the inmate up two flights of stairs, (2) in 2019 or 2020, Breckenridge kicked an inmate, (3) in 2020 or 2021, Breckenridge and Yoder were involved in dragging an inmate, (4) in 2020 a female officer (Green) hit an inmate in the back of the head with a sandwich, (5) in 2020, four officers (Callahan, Greco, Kingston, and Richie) used excessive force against an inmate who was restrained and shackled, (6) in 2020 Greco tased an inmate, and (7) in the same 2021 incident when Bush tasered the inmate, Bishop grabbed the inmate by the throat.

The evidence lacks enough information to determine if any alleged instance is comparable. There is no information about whether supervisors were the same, whether most of these incidents were reported or reviewed,[37] or enough of a description of circumstances to determine applicable policies, etc. Even though the lack of documentation and follow up is worrisome, it appears to be sloppy or poor management, as documented in the 2024 jail audit, and

---

[37] Green was ordered to anger management and the incident with Bishop is discussed infra, including n.39.

24

there is no indication it is related to race.[38] While Bishop's alleged use of force is from the same incident, only one other incident possibly occurred in 2021; all the others are from 2020 or earlier, separating them by almost a year or more from Bush's taser incident. Only one includes use of a taser, and it involves a single discharge, not three. The lack of a similarly situated comparator means there is not a prima facie case.

Even if there were, Bush cannot show pretext. The taser incident was captured on video and had multiple levels of review. All four officers filed incident reports. The reports prompted further review, starting with Dean, to Surrency, to Wells, to the Committee, then to Zagar to investigate. Each level of review had concerns about excessive force based on the three taser discharges, and the investigation concluded there was excessive force. Bush testified she did not know if the investigation was based on her race. Doc. 71-1 at 104. Although Bush disputes using excessive force herself, this reflects a disagreement with the business judgment of the Sheriff and does not establish pretext. See Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000).

---

[38] The 2024 jail audit report starts by noting that two-thirds (12 of 18) of internal investigations from the prior year involved corrections, and four of those involved excessive use of force or horseplay. Doc. 77-11 at 3. The audit "revealed documentation of uses of force reports are not being tracked or followed up on." Id. The issues included verbal reports not being documented, reports started but not completed, and reports completed months after the incident. Id.

Courts "are not in the business of adjudging whether employment decisions are prudent or fair." Id. (quoting Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir.1999)).

Bishop's alleged use of excessive force is part of the same video. Each person reviewing the video to assess Bush's actions would also have observed Bishop. Before Bush discharged her taser the first time, Bishop pushed the inmate against the wall when the inmate was not cooperating. Given the obvious qualitative difference in Bishop's actions, the Sheriff was entitled to treat Bishop and Bush differently.[39]

Although the failure to promote claim is not properly raised, the Court will address it.[40]  The prima facie case for failure to promote is slightly different,

---

[39] The difference is obvious in the Committee report. Doc. 71-1 at 335–39. The Committee "watched the video and the first issue we noted was . . . Bishop grabbed [the inmate] by the throat, pushing him against the wall." Id. at 337. It took "issue" with Bishop's behavior and noted "[a]lthough not a strike, it is still a technique not taught and could result in great physical harm." Id. The report addressed Bishop's behavior in one paragraph and recommended "Bishop receive remedial training on the appropriate methods and locations of strikes." Id. In contrast, the report spent a page and a half addressing Bush's behavior. It also took "issue" with Bush's first taser discharge, commenting it "could have been reasonable" but "[w]e believe tasing him at this point was unnecessary," and the "second and third [taser discharges] were unwarranted due to [the inmate] not offering any resistance whatsoever." Id. It recommended there be further investigation into Bush's behavior based on three possible violations of disciplinary standards, noted the incident might be criminal battery by Bush, and recommended remedial training for Bush. Id.

[40] Failure to promote is a discrete act and should be a separate claim. See Weiland v. Palm Beach Cnty. Sheriff's Off., 792. F.3d 1313, 1322–23 (11th Cir.

26

requiring Bush to show: (1) she belongs to a protected class; (2) she applied for and was qualified for a promotion; (3) she was rejected despite her qualifications; and (4) that other equally or less-qualified employees outside her class were promoted. <u>Brown v. Ala. Dept. of Transp.</u>, No. 09-15509, 597 F.3d 1160, 1174 (11th Cir. 2010)). Although the fourth element is disputed, the Court will address it as part of pretext, and presume, without deciding that Bush has established a prima facie case of discrimination based on failure to promote.

The Sheriff's reason for not promoting Bush is straightforward. He compiled scores for the test, interview and assessment. The top five candidates received further consideration, but Bush was sixth. Dean and Callahan, who respectively scored 13 and 23 points better than Bush, were promoted. [41] Although Bush argues "white employees without the same qualifications, rank and experience as Plaintiff were promoted," she only compares her experience and rank to Callahan, claiming he needed the test "curved" to pass. Doc. 79 at 30. Bush implies she was negatively impacted by the change to her interview time (which caused her to be late). [42] <u>See id.</u> at 5. But she cannot provide more

---

2015).

[41] There is no evidence of a maximum score, but the top scorer was Kingston, by more than 25 points. Bush argues Kingston should not have been permitted to test because he was on probation. Even so, Kingston is not a proper comparator because he was not selected. Doc. 71-1 at 235.

[42] Bush alleges assignments to booking assist with promotions (Doc. 78-30 ¶ 11) but does not offer any evidence, other than her own assertion, and does

27

information because materials from the promotion process were not preserved. Accordingly, she alleges spoliation and seeks sanctions.[43]

For her failure to promote claim, Bush must not only show she was minimally qualified, but that there are substantial disparities between the successful applicants and herself, such that no reasonable person could have chosen the selected candidates. See Barber v. Cellco P'ship, 808 Fed. App'x. 929, 936 (11th Cir. 2020). "The plaintiff must rebut the reason 'head on' and 'cannot succeed by simply quarreling with the wisdom of that reason.'" Id. (quoting Chapman, 229 F.3d at 1030). So long as the Sheriff has provided "an honest explanation of its behavior," the Court will "not sit as a super-personnel department that reexamines an entity's business decisions." Id.

---

not argue how it impacted any component score used for the promotion. Bush alleges white officers were trained differently and Hamby and Looney interreacted differently with white officers, but she fails to identify the alleged comparators or provide other details that might allow the Court to determine she was treated differently than a similarly situated comparator. A conclusory allegation of different treatment based on race is not enough. See Banks v. iGov Techs., Inc., 661 F. App'x 638, 644 (11th Cir. 2016). Plus, it is not clear the failure to train properly had any impact on Bush as she testified she was able to train herself.

[43] Spoliation is one of the arguments that only has a heading in Bush's brief because it is "incorporated by reference." See Doc. 79 at 14 n.1. In her earlier opposition, Bush sought "the sanction of striking any defense to the failure to promote as a consequence." Doc. 35 at 18. Even if the Court considered spoliation to be properly raised, there is no evidence the destruction or loss of materials was willful and the Court declines to impose sanctions under these circumstances. See Doc. 36-79 at 43–59.

Even though promotion materials were not preserved, there is some evidence about the process. Surrency testified his normal process was to exclude any question missed by 60% of test takers. The component and total scores are available. The candidate assessment score is a maximum of ten points and can be negative. The policy is for either the top three or top five scores to be further considered.

And the lacking information is more than just the missing promotion materials.[44] The Sheriff cannot identify who conducted interviews and did not preserve interview notes. Bush does not recall who interviewed her. There is no evidence why Bush's interview time was changed, and no evidence the time change was related to Bush's race. Apart from Surrency's testimony about his normal process, there is no evidence indicating prior tests also dropped test questions missed by too many test takers. Apart from having composite scores in the top five, there is no evidence why Dean and Callahan were recommended and selected for promotion.

Bush's dispute about dropped test questions is another disagreement with the Sheriff's business judgment that does not establish pretext. Bush has not established that her qualifications are so much better than either Dean or

---

[44] Perhaps there was discovery to help identify some of the missing information, but it is not apparent from the record. For example, other applicants might have been asked who conducted the interview.

Callahan that no reasonable person could have chosen them over her. In short, there is not sufficient evidence for the Court to conclude the Sheriff's reason was pretextual and a cover for intentional race discrimination.

Because the Court concludes that Bush has not shown enough to defeat summary judgment under McDonnell Douglas, it considers whether there is a convincing mosaic of evidence, sufficient to defeat summary judgment. For this, Bush must provide enough evidence for a factfinder to conclude an alleged adverse action was due to intentional race discrimination. Bush has multiple complaints about work and generally attributes all of them to race discrimination. In addition to the items that might be adverse employment actions, the evidence includes the 2024 audit about management problems at the jail. The audit discusses poor leadership, including issues with reporting excessive force concerns and problems with sexual harassment, but not racial discrimination. See Doc. 77-11. In short, there is not a convincing mosaic of evidence to create a fact issue that Bush was subjected to race discrimination. Accordingly, summary judgment is due to be granted on her race discrimination claims.

### D. Count III - Retaliation – FCRA

Retaliation claims based on circumstantial evidence also use McDonnell Douglas burden-shifting. Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1325 (11th Cir. 2020). For a prima facie case, Bush must show she: (1) engaged in

30

protected activity; (2) suffered an adverse employment action; and (3) a causal connection between the two. Kidd v. Mando Am. Corp., 731 F.3d 1196, 1211 (11th Cir. 2013). Again, the Sheriff disputes each element. If Bush establishes a prima facie case, the Sheriff can rebut the inference of retaliation by providing a legitimate business reason for the adverse action, with Bush then required to prove pretext to proceed with her claim. Retaliation is a "but-for" causation standard. Gogel v. Kia Motors Mfg. of Georgia, Inc., 967 F.3d 1121, 1135 (11th Cir. 2020).

Possible protected activity includes: (1) Bush's training complaint (April 2021), (2) Bush's complaint that Silva discriminated against her based on race (sometime before June 2021), (3) her complaint Rash was prejudiced and biased against her (June 2021), and (4) her complaint that two white officers were not investigated for improper inmate counts but Black officers were investigated and later terminated (late October 2021). Viewing events in the light most favorable to Bush, the Court presumes, without deciding, one or more of these is protected activity.[45]

---

[45] The complaint about Rash, coming after he counseled Bush about parking in the wrong spot, is more of a typical workplace complaint, not protected activity. While Bush describes Rash treating other, white officers, more favorably, there is no evidence her complaint raised a race concern. For example, Bush's declaration mentions complaining others were treated differently, and identifies others treated differently who are white, but does not claim she mentioned the race of others when she complained. See Doc. 78-30 ¶¶ 21–23. A conclusory allegation of different treatment based on race is not

Retaliation claims require the retaliatory action be "materially adverse" to a reasonable employee. Muldrow v. City of St. Louis, 601 U.S. 346, 357 (2024). Possible adverse actions include: (1) not being trained properly about booking, (2) not being promoted to sergeant, (3) being disciplined for tardiness, (4) being investigated for leaving early, (5) being investigated for taser use, (6) the anonymous notes regarding her performance, and (7) being constructively discharged.

The failure to train is not an adverse action supporting retaliation because it did not involve a material change in Bush's employment. See Muldrow 601 U.S. at 357. Moreover, it is not causally connected to protected activity because it occurred before any complaint. Debe v. State Farm Mut. Auto. Ins. Co., 860 F. App'x 637, 641 (11th Cir. 2021).

Failure to promote is an adverse action. Discipline can be an adverse action. The Court is doubtful the internal investigations or anonymous notes are adverse actions but will presume, without deciding, they could be. As already addressed, there was no constructive discharge.

Next, Bush must show the protected activity and adverse action are causally connected. Timing and circumstances both matter. Close temporal proximity between protected activity and an adverse action supports finding a

enough. See Banks v. iGov Techs., Inc., 661 F. App'x 638, 644 (11th Cir. 2016).

32

causal connection. But a gap of more than three months, without more, is too long to demonstrate a causal connection. Chandler v. Sheriff, Walton Cnty., No. 22-13698, 2023 WL 7297918 at *2 (11th Cir. Nov. 6, 2023) (citing Drago v. Jenne, 453 F.3d 1301, 1308) (11th Cir. 2006). And the adverse action has to be something that started after the protected activity. See Debe, 860 F. App'x at 640 (an adverse action that occurs before protected activity is not causally connected because the protected activity could not have motivated the adverse action); Edgerton v. City of Plantation, 682 F. App'x 748, 750-51 (11th Cir. 2017) (activities that occurred both before and after protected activity, lack a causal connection to the protected activity, but changes in frequency or severity might indicate a causal connection). For a causal connection to exist, the person responsible for the adverse action must generally know of the protected activity. Cf. Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) (close temporal proximity alone is not enough if there is unrebutted evidence the decision maker was unaware of the protected activity).

Bush argues her protected activity started in April 2021 (when she complained about training at the booking desk) and continued through October (when she reported the miscount issue), and that "almost immediately" she began suffering retaliation. Doc. 79 at 27. The Sheriff argues there is not a causal connection because Bush cannot show decision makers for the alleged adverse actions were aware of the protected activity.

33

When the sergeant promotions were announced, Bush had made three complaints: lack of training at the booking desk, Silva's alleged race discrimination, and the parking spot dispute with Rash. Who knew of each? Surrency knew of the complaint against Silva, Surrency and Dunn were aware of the parking spot issue with Rash. Surrency and Dunn were both involved in the promotion process, along with Silva and Yoder. Surrency was involved in dropping some of the test questions. Surrency made recommendations to Wells, who made recommendations to the Sheriff. Without identifying any individual, Bush argues having "biased employee[s]" involved can result in an inference the employment decision was tainted. See Doc. 79 at 28–29.[46] But Bush does not provide evidence that Wells or the Sheriff knew of any of Bush's complaints, that Wells or the Sheriff excluded Bush from the top five candidates based on her complaints, or how the promotional process might have been tainted.

The Court is skeptical whether Bush has established a prima facie case for retaliation based on failure to promote. Even if she has, the Sheriff provided

---

[46] Bush argues her only burden is to show the adverse action and protected activity are "not completely unrelated." Doc. 79 at 26 (citing Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998). Even though the Wideman language is fairly broad, the Wideman holding relied on timing - that "the series of adverse employment actions commenced almost immediately after management learned she had filed the charge." Id. at 1457. Bush also argues incidents should viewed cumulatively, not separately, but this does not address the need to establish a causal connection, and the Court has already decided there was not constructive discharge.

34

business reasons for his decision. Bush was not promoted because she scored sixth out of eight candidates, and she has not established this reason is pretextual. Only two of the five forwarded candidates were promoted. At least one other person passed the test before the curve and was not promoted.[47]

The only alleged protected activity after the failure to promote is approximately three months later, when Bush complains to Johnson that Bishop and Walker did not recount, and four months after she complained about Rash.[48] Given the temporal separation (and lack of evidence to show a connection), the Court separately analyzes later possible adverse actions (discipline and investigations).

On October 29, 2021, Bush complained to Johnson because Walker and Bishop failed to do a recount as ordered. Nothing was done. Bush characterizes this a race complaint because she asked Johnson if there would be an investigation into Bishop and Walker's actions, like the investigation into two Black and one bi-racial officer. But there is no evidence Bush mentioned a race concern to Johnson and no evidence she mentioned it to anyone else. The failure to investigate Bishop and Walker did not impact Bush.

---

[47] Bush testified she was one of three who passed without the curve and Callahan needed the curve to pass.

[48] Wells made recommendations for promotion to the Sheriff on July 20, 2021. Doc. 71-1 at 234.

Less than two weeks later, Bush left her shift for personal reasons. She informed Dean and Johnson (who was home). Bush's departure left an understaffed shift more understaffed and Johnson returned to the jail to provide coverage. There was some dispute about permission to leave and need to return. Accordingly, Dunn requested an investigation. Johnson was a witness in this investigation and indicated he thought the "incident was a matter of miscommunication." Doc. 71-1 at 245. This investigation did not sustain any violations. Apart from Johnson's role as witness, there is no evidence anyone involved with the early departure investigation knew of the recount issue, including Dunn who requested the investigation.

In another two weeks, Bush and three other officers were moving an inmate who was not cooperative. Bush tased the inmate three times, and another investigation was requested, this time by Surrency. Instead of approving the investigation request, Wells asked for a Committee review, which recommended further investigation. No one on the Committee—Miller, Yoder or Vieira—was in Bush's chain of command or had knowledge of any prior complaint. Based on the Committee report, Wells approved an internal investigation and Zagar conducted it. The investigation sustained violations, but Bush had already resigned.

Here, the circumstances of the investigations do not support treating them as adverse actions. The underlying incident for each is not disputed and

36

the investigations were to determine if policy violations occurred. Even if the investigations (separate from their outcomes) could be considered adverse actions, Bush cannot show pretext.

In January 2022, Dean reprimanded Bush for being tardy. Bush admits she was tardy and had been tardy before. Bush's complaint is that tardiness was previously tolerated. The reprimand indicates Dean counseled Bush at least twice before the discipline. There is no evidence Dean was aware Bush complained to Johnson about failure to count, and even if the discipline could be an adverse action here, there is no causal connection to protected activity. Discipline for admitted misconduct is not retaliation, and Bush cannot establish pretext.

Finally, there is the issue of anonymous notes. Bush argues these are evidence of retaliation and they escalated after her protected activity. The three notes from Dean occurred before the Rash incident, two notes are in July, and the remaining eleven start on October 15 continuing through December 26, with one before Bush reports the recount issue. All are from 2021. The anonymous notes indicate counseling for "scolding officers in front of inmates," "jumping the chain of command," doing a "receipt for a cash bond instead of a writ," paperwork mistakes, being tardy, and similar occurrences. The only discipline related to any substance in the notes is the January 2022 discipline for tardiness. None of the notes or substance are referenced in either investigation.

37

There is no evidence Bush was aware of the notes during her employment. The notes were not a materially adverse action to support retaliation.

Although Bush has a myriad of complaints and the 2024 audit has multiple examples of poor leadership, to defeat summary judgment Bush must establish the reason for an alleged adverse action is pretextual. This she cannot do. Neither is there evidence of a "convincing mosaic."

Summary judgment is due to be granted on the FCRA retaliation claim.

## III.   CONCLUSION

The jail audit provides ample evidence of lack of training, lack of accountability, and bad behavior from managers. There is also evidence that Bush's relationships at work were difficult and stressful and she may have subjectively attributed that to her race. But, having evaluated the evidence in the light most favorable to her, there is no genuine evidence of material fact regarding Bush's whistleblower, race discrimination and retaliation claims.

Accordingly, it is hereby

**ORDERED:**

1. Defendant's Renewed Motion for Summary Judgment (Doc. 70) is **GRANTED**;

2. The Clerk is directed to enter judgment in favor of Homer "Gator" DeLoach, in his official capacity as Sheriff, Putnam County, Florida, and against Kendra Bush and close the file.

38

**DONE AND ORDERED** in Jacksonville, Florida the 24th day of March, 2026.



TIMOTHY J. CORRIGAN
Senior United States District Judge

ddw
Copies:

Counsel of record